UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

KEVIN DWAYNE THERIOT,

                Plaintiff,

v.

KRIS TASKILEA, et al.,

                Defendants.

_____/

Case No. 2:25-cv-149

Honorable Phillip J. Green

**<u>OPINION</u>**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff paid the full filing fee on July 9, 2025.  Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States Magistrate Judge. (ECF No. 10.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. § 1915A(b), and 42 U.S.C. § 1997e(c).  The Court is required to conduct this initial review prior to the service of the complaint.  *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997).  Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States Magistrate Judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ."

28 U.S.C. § 636(c).  Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a consent from the defendants[; h]owever, because they had not been served, they were not parties to this action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.  The Court will deny the following motions filed by Plaintiff: (1) motion to appoint counsel (ECF No.

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

2); (2) motion for a preliminary injunction (ECF No. 4); (3) motion to change venue (ECF No. 5); (4) motion for relief from judgment (ECF No. 7); and motion for leave to proceed *in forma pauperis* (ECF No. 13).  The Court will grant Plaintiff's motion to expedite (ECF No. 6), "motion to notice actual claim/pleading" (ECF No. 11), and "motion for order to allow access to the courts" (ECF No. 12) to the extent that the Court has considered Plaintiff's claims for relief in this opinion.

## Discussion

### I.    Factual Allegations

Plaintiff is a well-known filer in this Court.  Prior to the instant action, Plaintiff had filed 60 separate civil rights actions in this Court.  Out of those 50, all but 10 were filed in the years 2018 and 2019.  Plaintiff has accrued "three strikes" for purposes of 28 U.S.C. § 1915(g), and many of his prior lawsuits have been dismissed for Plaintiff's failure to pay the full filing fee after failing to demonstrate imminent danger of serious physical harm in order to be granted leave to proceed *in forma pauperis*.  Presumably, that is why Plaintiff paid the full filing fee for the instant action.

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan.  The events about which Plaintiff complains occurred at that facility, as well as at the following facilities: (1) the Baraga Correctional Facility (MF) in Baraga, Baraga County, Michigan; (2) the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan; and (3) the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan.

Plaintiff has named numerous individuals as Defendants in this action, and he indicates that he is suing all named Defendants in their official capacities only. (Compl., ECF No. 1, PageID.3.)   First, Plaintiff sues MDOC Director Heidi Washington and MDOC Hearings Administration Richard Russell.

Plaintiff sues the following ICF personnel: Warden Unknown Bonn, Deputy Warden Unknown Gifford, Dr. Unknown Siyiema, Nurse Unknown Cyphers, Lead Psychiatrist Unknown Miranka, and Psychiatrist Unknown Smith.

Plaintiff sues the following URF personnel: Warden Jeffrey Woods, Sergeant Thompson, and Corrections Officers Unknown Bender, Unknown Libby, and Unknown Larson.

Plaintiff sues the following MBP personnel: Warden Robert Nepal, Deputy Warden Erica Huss, Grievance Coordinator Unknown Mohr, Inspectors Unknown Tasson and Unknown Niemsto, Prison Counselor Unknown Calzetta, Resident Unit Manager Vittelio, Assistant Resident Unit Managers Horocks and Latenen, and Corrections Officer Johnson.

Plaintiff sues the following AMF personnel: Wardens Kris Taskilea, Unknown Marshall, Unknown Mackie, and Unknown Place; Deputy Wardens Unknown Dums, Unknown Lesatz, and Unknown Nurkala; Prison Counselors Unknown Bessner, Unknown Wilson, Unknown Bastian, and Unknown Kowalski; Inspectors Unknown Petaga, Unknown Minnerick, and Unknown Cummings; Administrative Assistant Unknown Hoffman; Resident Unit Managers Unknown Niemi, Unknown Gongreua, and Unknown Pertu; ARUS Unknown Healy; Corrections Officers Unknown Mosafro,

Unknown Cluster, Unknown Goodrgua, Unknown Kutchie, Unknown LaChance, Unknown Wilson, Unknown Sullivan, Unknown Antilla, Unknown Lee, Unknown Capello, Unknown White, Unknown Larson, Unknown Morgan, Unknown DeForge, Unknown Cirvio, Unknown Kirchoffer, Unknown Lancott, and Unknown Bauman; Doctor Unknown Oh; Supervisor Gloria Hill; Nurse Supervisor Aaron Jeffries; and Nurses Nicole Sunberg and Unknown Duecetti.

Finally, Plaintiff names the following individuals as Defendants, but does not indicate at which facilities they were employed: Unknown Meals; Unknown Dalotti; Corrections Officers Unknown Lorrendo, Unknown Sanchez, and Unknown Huhta; Unknown Somma, Unknown Miller, Unknown Hemmila, Unknown Burke, Unknown Holman, Unknown Pesola, Unknown LeClare, Unknown Haataja, Unknown Beeseley, and Warden Unknown Donn.

Plaintiff's complaint is lengthy, and the events described therein span more than a decade. Plaintiff has broken down his allegations into categories; accordingly, the Court will rely upon those categories to set forth Plaintiff's allegations below.

A.    **Misuse of Force—URF**

Plaintiff alleges that on January 29, 2013, he was in segregation at URF when Defendant Libby approached his cell door and stated, "Pack up your property, you are riding out in the morning." (Compl., ECF No. 1, PageID.6.) Plaintiff responded that he was ready to go because the only property in his cell was "state forms and other useless paperwork" that he no longer needed. (*Id.*, PageID.7.)

Defendant Libby left and returned a few moments later with Defendants Thompson, Bender, Larson, and three other officers, all of whom were wearing riot gear. (*Id.*) Plaintiff asked, "What's going on," but was immediately gassed without any warning. (*Id.*) While being assessed by healthcare staff, Plaintiff "was then pushed down by staff[,] causing his stomach area to collide with a table." (*Id.*)

Plaintiff received a Class I misconduct for disobeying a direct order. (*Id.*) Plaintiff claims that the original order for him to pack up his property came from Defendant Woods. (*Id.*) Plaintiff claims that even though staff claimed Plaintiff was gassed because he did not obey a direct order, Plaintiff claims that the real reason that he was gassed because Defendant Woods wanted to retaliate against Plaintiff for filing a lawsuit in 2009 while Woods was the Warden of the Kinross Correctional Facility. (*Id.*) Plaintiff submitted a grievance and letters about the incident to Defendant Washington, who did nothing. (*Id.*)

## B.    Denial of Access to the Courts

Plaintiff was transferred to AMF on January 30, 2013. (*Id.*) The next day, the Security Classification Committee, consisting of Defendants Niemi, Gongreua, and Healy, held a meeting, during which Plaintiff told them what had happened at URF on January 29, 2013. (*Id.*) Defendant Niemi said, "And? We can treat n*****s any way we want to up here!" (*Id.*) Defendant Gongreua pointed at himself and Defendant Niemi and stated, "You are looking at the two most powerful men here at [AMF] and we can make your life a living hell if you don't leave this alone!" (*Id.*) Defendant Healy said, "This is your first and last warning, don't bring this up again!" (*Id.*)

Plaintiff, however, did not heed those warnings, and spoke to Defendants Lesatz, Mackie, Miller, LeClare, Burke, Place, Petaga, and "a host of other administrative staff members" about what had happened on January 29, 2013.  (*Id.*, PageID.8.)  Plaintiff contends that for years, these staff members ordered officers to impede Plaintiff's actions in court by, for example, not sending his mail out.  (*Id.*) Plaintiff alleges that Defendant Niemi led these "drastic steps" to discourage Plaintiff from seeking an investigation.  (*Id.*)  Plaintiff was moved from unit to unit.  (*Id.*)  With each move, Plaintiff's property was "packed up and resent to the property room with it taking days to be returned with any accumulated documents on [the January 29, 2013] incident now missing."  (*Id.*)  When that tactic didn't work, Plaintiff was placed in segregation "by the writing of a fraudulent, non-bondable Class I misconduct."  (*Id.*) Plaintiff contends that he received such misconducts on April 28, 2013, October 22, 2013, October 1, 2014, and April 29, 2016.  (*Id.*)

Plaintiff goes on to suggest that another tactic used was to deny him healthcare services.  (*Id.*)  After Plaintiff arrived at AMF, he "started to see small specks of blood in his feces so he put in a healthcare kite."  (*Id.*)  Months went by, and Plaintiff was finally told by Defendants Oh, Jeffries, Hill, Meals, Dalotti, and Sunberg that they had been ordered by Defendant Niemi to not provide healthcare services to Plaintiff as long as Plaintiff continued to seek an investigation regarding the January 29, 2013, gassing.  (*Id.*, PageID.9.)

Plaintiff goes on to suggest that staff at AMF denied him access to the courts "with physical violence and the denial of legal supplies."  (*Id.*)  Plaintiff was barred

from attending the law library while in general population, and he was not allowed

to receive law library services in segregation.  (*Id.*)  Plaintiff claims that he could not

"properly and timely draft up [a] lawsuit on [the] situation without law library access.

(*Id.*)  Moreover, despite being indigent from 2013 to 2015, staff at AMF would not

process Plaintiff's indigent requests, so he could not receive paper, envelopes, pens,

manila envelopes, and white envelopes.  (*Id.*)

Plaintiff contends that administrative staff at AMF sent Defendants Mosafro,

Cluster, Goodrgua, Pesola, Bauman, Haataja, Kutchie, Morgan, Huhta, LaChance,

and Hemmlie to steal Plaintiff's grievances, drafted letters, and drafted lawsuits

whenever Plaintiff left his cell.  (*Id.*)  Plaintiff states that these thefts occurred even

when he did not leave his cell.  (*Id.*)  With each theft, Plaintiff was told that Defendant

Niemi had given the order.  (*Id.*)

Plaintiff was gassed on May 3, 2016, and February 14, 2017, in attempts to

stop him from seeking any information regarding the "illegal 1-29-13 gassing, but

also to stop [Plaintiff from] hiding in the cell from staff."  (*Id.*, PageID.10.)  Around

the time of the February 14, 2017, gassing, staff were "hammering" Plaintiff with

multiple fraudulent Class I misconducts.  (*Id.*)  Staff were also sexually assaulting

and sodomizing Plaintiff.  (*Id.*)

Plaintiff contends that these sexual assaults also occurred at MBP in early

2016, after Plaintiff told Defendant Somma, the psychiatrist at MBP, that he had

been molested as a child while in the Boy Scouts.  (*Id.*)  Plaintiff was also placed in

9

segregation at MBP.  (*Id.*)  However, because of a sexual assault that occurred at MBP on May 3, 2016, Plaintiff was returned to AMF.  (*Id.*)

Once back at AMF, Plaintiff began to write to two state representatives regularly.  (*Id.*, PageID.11.)  Plaintiff contends that the issues he experienced before stopped temporarily.  (*Id.*)  However, these issues began again in 2018.  (*Id.*) Plaintiff's numerous grievances and kites were ignored or not filed by staff.  (*Id.*)

Plaintiff contends that on numerous occasions, he tried to send the instant complaint to this Court, as well as to the United States District Court for the Eastern District of Michigan.  (*Id.*, PageID.12.)  He argues, however, that Defendants Beeseley and Haataja would remove the expedited legal mail forms from Plaintiff's cell, even though they had been filled out and signed by Defendant Lancot.  (*Id.*)  Plaintiff filed a grievance, but claims that the grievance was not acknowledged.  (*Id.*)

Plaintiff claims that since January of 2022, Defendants Miller, Beeseley, and Lancot stopped him from sending any mail to any federal district court.  (*Id.*) Defendant Miller directed Defendant Lancot to not pick up Plaintiff's mail.  (*Id.*) Defendant Miller also directed Defendants Beeseley and Haataja to withhold food trays from Plaintiff on any day that Plaintiff attempted to send out legal mail.  (*Id.*) Eventually, Defendants Beeseley and Haataja refused to provide legal mail forms to Plaintiff.  (*Id.*)

Plaintiff again tried to send a copy of this pleading to this Court and the Eastern District of Michigan in January of 2023.  (*Id.*)  However, on January 3, 2023, Defendants Pertu, Beeseley, Haataja, and Bauman came to Plaintiff's cell, and

10

Defendant Pertu said, "We need to shake you down." (*Id.*, PageID.13.) Plaintiff complied, and when he returned to his cell, he found that his expedited legal mail forms were missing. (*Id.*) Plaintiff claims that in the following weeks, Defendants Beeseley, Haataja, and Bauman admitted to removing the forms. (*Id.*)

Plaintiff tried to send an updated copy of his complaint on April 7, 2023, but Defendant Wilson refused to send the mail, stating that Defendant Pertu ordered him not to. (*Id.*) Plaintiff waited until Defendant Pertu was off, and he attempted to mail the complaint again on two separate occasions in October of 2023. (*Id.*) Defendants Niemi and Wilson received the legal mail. (*Id.*) Plaintiff claims that he learned from a family member that neither lawsuit had been filed. (*Id.*)

Plaintiff then goes on to mention an incident in May of 2016 where he did not have enough money to send mail to various agencies. (*Id.*, PageID.14.) Plaintiff claims that Defendants Huss, Nepal, and other administrative staff at MBP made the decision to take Plaintiff's outgoing legal mail, particularly mail addressed to President Obama, open it to read the contents, and then place it in a new envelope, on which was forged Plaintiff's name, number, and address. (*Id.*) Plaintiff suggests that similar mail tampering occurred in 2021, 2022, and 2023. (*Id.*)

Plaintiff mentions that on October 20, 2023, Defendant Pertu directed Defendant Kowalski to hold and open legal mail that Plaintiff was sending to an attorney. (*Id.*) Plaintiff claims that after sending kites to the mail room, he received a copy of the expedited legal mail form on October 25, 2023. (*Id.*, PageID.15.)

Plaintiff noticed that the date and time for receipt by staff had been changed from October 20, 2023, to October 30, 2023.  (*Id.*)

Plaintiff goes on to state that he began to write four copies of every grievance that he submitted because "certain grievances were still not being filed and certain ones were still being stolen."  (*Id.*)  Plaintiff would also give copies to other prisoners to hold and keep.  (*Id.*)  Plaintiff did this so that he "would still have the evidence of that grievance actually being sent in."  (*Id.*)

Plaintiff tried to send an updated version of Case No. 2:18-cv-92 to this Court on four separate occasions in early 2024, but claims the cases were not filed.  (*Id.*) Plaintiff was transferred to ICF on April 30, 2024.  (*Id.*)  After his transfer, he tried to send the updated version on May 1, 2024, June 1, 2024, and July 1, 2024, but claims that the cases were not filed.  (*Id.*)  Plaintiff also sent a motion for reconsideration each time he tried to mail the complaint, as well as updated complaints for several other cases; those motions were also not filed.  (*Id.*)  Plaintiff claims that several appeals that he sent to the United States Court of Appeals for the Sixth Circuit were also not filed by that court.  (*Id.*)

Plaintiff contends that because he has been denied access to the courts, he has been unable to obtain relief for the following conditions: (1) being held in segregation since April 29, 2016; (2) being denied health care since January 29, 2013; (3) mail tampering; and (4) being kept around enemies who assault him physically and sexually.  (*Id.*, PageID.15–16.)

## C.    Denial of Due Process

In this section of his complaint, Plaintiff states that on April 29, 2016, while at MBP, he was placed in segregation despite not receiving a major misconduct or a notice of intent pending investigation.  (*Id.*, PageID.17.)  Plaintiff suggests that he was placed in segregation because of a threat made by Defendant Niemi in 2014.  (*Id.*)  Plaintiff claims that Defendant Niemi stated, "If you try to get an investigation for the [January 29, 2013, gassing] again, or if we find any more lawsuits about it, I'm going to have you placed in segregation and you'll never get out!" (*Id.*)  Later that day, Defendants Nepal, Huss, and Vittelio told Plaintiff that he was in segregation for seeking an investigation into the 2013 incident.  (*Id.*)

That same day, Plaintiff received a Class I misconduct, written by Defendant Johnston, charging Plaintiff with assault and battery.  (*Id.*, PageID.18.)  Plaintiff claims that this was a fraudulent misconduct because he had never had contact with Defendant Johnston before coming to segregation.  (*Id.*)  Plaintiff wrote a statement on his own behalf, asked for the camera footage to be reviewed, and asked the hearing investigator to obtain statements from "both of his prisoner neighbors."   (*Id.*)  According to Plaintiff, neither the statements nor the footage was obtained.  (*Id.*)

Plaintiff claims that to prevent him from attending his misconduct hearing, he was gassed, sodomized, and placed on suicide watch on May 3, 2016.  (*Id.*, PageID.19.)  He avers that to ensure that Plaintiff was found guilty, Defendants Nepal and Huss arranged for Plaintiff's hearing to be held on May 4, 2016, while Plaintiff was still on "forced" suicide watch and could not attend per MDOC policy.  (*Id.*)  Plaintiff was released from suicide watch on May 6, 2016, at which time Plaintiff learned that he

had been found guilty at the May 4, 2016, hearing and had been classified to punitive administrative segregation." (*Id.*)  Plaintiff avers that Defendants Nepal and Huss and the hearing officer stated that Defendant Calzetta had asked Plaintiff if he wanted to attend his hearing, and that Plaintiff had said no. (*Id.*)  Plaintiff asked for a rehearing, but claims that his request was neither processed nor filed by Defendant Russell. (*Id.*, PageID.20.)

Plaintiff filed grievances about the issue, and claims that he received new Class I misconducts in return. (*Id.*)  Plaintiff avers that these misconducts were issued to "discourage Plaintiff from these types of legal challenges" and to explain why Plaintiff's status on segregation was being continued. (*Id.*)  Plaintiff states that he received numerous misconducts from 2016 until 2021, and that each came "after a legal challenge to [Plaintiff's May 6, 2016] illegal classification or anytime Plaintiff was misconduct free long enough to eventually legally be considered for general population privileges." (*Id.*)

For example, Plaintiff indicates that in 2020, he was found guilty of disobeying a direct order and possession of a weapon, even though both charges were allegedly fraudulent. (*Id.*, PageID.22.)  Plaintiff claims that Defendant Lancot threatened to not allow Plaintiff to attend the hearing. (*Id.*, PageID.23.)  Defendant Pertu allegedly admitted to orchestrating the misconducts. (*Id.*)  Plaintiff wrote kites to Defendant Taskilea, but nothing was done. (*Id.*)  After Plaintiff was found guilty, he tried to appeal, but claims that Defendant Russell just sent the requests back to Plaintiff "with no reason stated." (*Id.*)

Plaintiff goes on to state that AMF administrative staff eventually "transferred Plaintiff to ICF I-max with documentation forged to say that he was now released to general population." (*Id.*, PageID.24.)  Plaintiff claims that this was done to cover up the fact that Plaintiff had illegally been held in segregation since May 6, 2016.  (*Id.*) However, staff at ICF were "not completely ready to do AMF['s] dirty work" and instead noted that Plaintiff was "not in general population, but the Start Program and could and would be released to [general population] if and when he moves up." (*Id.*)

Because of that statement by staff at ICF, Plaintiff believed that he would eventually be released to general population.  (*Id.*)  He submitted a healthcare kite to receive the tuberculosis test "as he did not want this to be the excuse used to hold him up once [general population] privileges would eventually be considered."  (*Id.*) Instead, ICF staff refused Plaintiff the tuberculosis test, removed him from his Start Program group, and told Plaintiff "he had to stay at Stage 0."  (*Id.*, PageID.25.) Plaintiff claims that the only way to go to general population from the Start Program is to participate in group.  (*Id.*)  Plaintiff contends that Defendants Bonn and Gifford told Plaintiff that "they would continue [AMF's] permanent segregation stay plan they had for him," and that Defendants Miranka and Smith told Plaintiff that he would not be receiving any mental health treatment.  (*Id.*)  Likewise, Defendants Siyiema and Cyphers told Plaintiff that he would not receive any healthcare treatment at all.  (*Id.*)  Plaintiff was then placed on modified access grievance restriction.  (*Id.*)

### D.    Sexual Assault

In this section of his complaint, Plaintiff returns to 2018.  He alleges that on May 15, 2018, Defendant Lee came to his cell and told him that he had a phone call from a judge.  (*Id.*, PageID.26.)  Defendants Lee and Capello escorted Plaintiff to Defendant Bastian's office for the call.  (*Id.*)  Defendant Bastian was not inside the office.  (*Id.*)

Plaintiff alleges that once he was inside the office, Defendants Lee, Capello, Larson, White, Morgan, Deforge, Cirrio, and Kirchoffer pointed their tasers at Plaintiff.  (*Id.*)  Defendant Caruso directed Plaintiff to give them all oral sex, or he would be tased.  (*Id.*)  Plaintiff responded, "then kill me, because I'm not doing it!" (*Id.*)  Ultimately, Defendant Larson "football tackled" Plaintiff from behind, causing Plaintiff to fall on his face.  (*Id.*)  The officers then began kicking Plaintiff, and Plaintiff finally yelled, "Okay!"  (*Id.*)  Plaintiff contends that "he was forced to use [his] hand to stimulate their penises until each ejaculated."  (*Id.*)

Plaintiff was placed back in his cell.  (*Id.*)  He states that he did not file a grievance or a Prison Rape Elimination Act (PREA) complaint because he had been placed on grievance modification status.  (*Id.*)  Plaintiff instead mentioned the incident in the complaint he filed in Case No. 2:18-cv-70.  (*Id.*)  Plaintiff was "extremely terrified" and "planned on barricading [himself] in the cell."  (*Id.*, PageID.27.)

On June 12, 2020, Defendants Lee and Larson came to Plaintiff's cell and told Plaintiff to come out for a shakedown.  (*Id.*)  Plaintiff refused because of the physical and sexual assaults he alleged he endured at the hands of AMF staff many times.

(*Id.*)  Defendant Larson said told Plaintiff that Defendant Pertu had ordered that Plaintiff's cell be shaken down, and that he did not "care about that lawsuit stuff" Plaintiff had filed.  (*Id.*)  Defendant Larson told Plaintiff that Defendant Niemi had already given permission to use chemical agents if Plaintiff refused to comply.  (*Id.*)

Plaintiff was still hesitant to leave his cell.  (*Id.*)  Defendant Pertu eventually approached and said, "Yeah, Theriot, I ordered for your cell to be shaken down. Just come out, you can wait in my office with me where it's safe, I know we had our problems in the past, but this is legit."  (*Id.*)  When Plaintiff asked why his cell needed to be shaken down, Defendant Pertu noted that per MDOC policy, each prisoner's cell needed to be shaken down at least once a month.  (*Id.*)

Plaintiff finally agreed to leave his cell and was escorted out by Defendants Lee, Larson, and Pertu.  (*Id.*, PageID.28.)  When they arrived at Defendant Pertu's office, Plaintiff saw that Defendants Deputy Warden Niemi, ARUS Niemi, and Capello and Kirchoffer were there.  (*Id.*)  They all pointed tasers at Plaintiff, and Defendant Lee said, "You know what this is, either give us your hand or we'll give you our hand!"  (*Id.*)  Plaintiff claims that he was forced to "masturbate these staff members, a forced sexual act [he] did not want to perform but did it to save [his] life." (*Id.*)

Plaintiff filed a PREA complaint about that incident, as well as the incident from 2018.  (*Id.*)  Defendant Wilson rejected Plaintiff's attempt to use an expedited legal mail form to submit the PREA complaint, but instead personally dropped off the complaint to the grievance coordinator.  (*Id.*)  Plaintiff contends that he was still kept

around the staff who sexually assaulted him, causing him to be "verbally harassed, sexually harassed, and threatened with physical violence constantly." (*Id.*)  Plaintiff contends that the officers who sexually assaulted him coerced him "into signing a confession stating the incidents . . . [did not] happen" in order to end proceedings regarding the PREA complaint.  (*Id.*)  Plaintiff sought to appeal months later, but claims that AMF's administrative staff "did everything in their power to stop this legal process to obstruct justice and cover for [AMF's] staff." (*Id.*)

Plaintiff claims that staff also stole relevant evidence out of his cell, precluding him from grieving the incidents that he asserted in "Cases 2:18-cv-70 through and beyond 2:19-cv-59." (*Id.*, PageID.29.)  He filed a grievance, but Defendant Hamel rejected it, stating that Plaintiff was on modified access.  (*Id.*)  Plaintiff contends that restriction had ended before he filed the grievance.  (*Id.*)  Plaintiff submitted several requests to submit grievances, but those requests were not honored.  (*Id.*)  Plaintiff also contends that Defendants Hamel and Miller refused to give Plaintiff a copy of the "said 2018 memorandum modified access grievance restriction." (*Id.*)  Plaintiff claims that while on modified access, he was sexually assaulted on several other occasions.  (*Id.*, PageID.30.)

### E.    Denial of Medical Care

Plaintiff then turns to his allegations regarding medical care, averring that he has been denied healthcare since January 30, 2013.  (*Id.*, PageID.31.)  He contends that while at AMF, Defendants Oh, Hill, Jeffries, Meals, Dalotti, and Sunberg denied Plaintiff treatment for blood in his feces, which Plaintiff speculates "could be hepatitis C or worse and could lead to a coma or death." (*Id.*)  Plaintiff claims that the annual

tuberculosis screening could reveal if Plaintiff has hepatitis C, but that "this test has been specifically denied." (*Id.*)  Plaintiff claims that Defendants Oh, Hill, Jeffries, Meals, Dalotti, Sunberg, and Duecetti told Plaintiff that he would not receive healthcare services because of an order given by Defendant Niemi. (*Id.*, PageID.31, 33.)  Plaintiff avers that when Defendant Niemi retired, Defendant Pertu "up[held] the order." (*Id.*, PageID.31.)  Plaintiff states that he "still has this untreated ailment during the filing of this and denied all health services including dental for years." (*Id.*)  Plaintiff also mentions being denied optometry services. (*Id.*, PageID.33.)

Plaintiff claims further that he has been denied the COVID-19 vaccine. (*Id.*, PageID.31.)  Plaintiff contracted COVID-19 and was placed in quarantine on December 8, 2021. (*Id.*, PageID.32.)  He contends that his placement in quarantine allowed Defendants Lee, Capello, Wilson, Sullivan, Antilla, and Lorendo to retaliate against Plaintiff for filing a PREA grievance as well as Case No. 2:18-cv-70. (*Id.*)  Plaintiff claims that these Defendants placed him a cell that was still dirty. (*Id.*)  He avers that the cell had "no soap, toilet paper, sponges, or . . . heat." (*Id.*)  Cleaning supplies, showers, and phone calls were withheld. (*Id.*)  Plaintiff did not receive clean laundry, trays were delayed, and medical treatment was withheld. (*Id.*)  Plaintiff claims that Defendants Lee and Capello "then offered sexual favors in place of the things being withheld." (*Id.*)

Plaintiff goes on to state that in 2004, he "pinched a nerve in his back during a weight pit accident." (*Id.*)  A doctor told Plaintiff that he needed surgery. (*Id.*)  However, the MDOC chose an alternative plan. (*Id.*)  Plaintiff claims that "[t]his

alternative plan was to do nothing and let the injury heal on its own." (*Id.*)  Plaintiff

contends that shortly after, he would experience flare-ups in his back when "doing

exercises or nothing at all." (*Id.*, PageID.34.)  Plaintiff experienced varying degrees

of pain from these flare-ups. (*Id.*)  On some occasions, Plaintiff could "barely stand

or leave his cell," and could not work or "function naturally." (*Id.*)

Plaintiff contends that because the injury was not treated, he "now lives every

day of his life with the sharp pain in his lower back." (*Id.*)  Plaintiff can no longer lay

on his back for long or it causes more pain. (*Id.*)  Plaintiff speculates that because

the MDOC disregarded the recommendation for surgery, his injury "will continue to

get worse until Plaintiff is crippled." (*Id.*)

Plaintiff then mentions several other health issues, including: (1) untreated

cavities and tooth infection; (2) a rash on his right leg; (3) painful toenail fungus; (4)

a painful cyst on the back of his right wrist; and (5) varicose veins. (*Id.*)  Plaintiff

speculates that he may have developed other ailments due to the lack of healthcare.

(*Id.*)  Plaintiff contends that he needs to be tested for tuberculosis, heart disease, high

blood pressure, and diabetes. (*Id.*)  Plaintiff also mentions that he needs a new pair

of glasses, as well as a new pair of "TED hose." (*Id.*)  Plaintiff avers that he needs the

flu and COVID-19 vaccines. (*Id.*)

### F.    Start Program

As set forth *supra*, Plaintiff contends that he is now held in the Start Program

at ICF. Plaintiff claims that in "Stage 0 Unit 2, [he] can only leave his cell in handcuffs

escorted by two officers." (*Id.*, PageID.48.)  Moreover, Plaintiff cannot order Secure

Paks. (*Id.*, PageID.49.)  In Stage 0 Unit 2, Plaintiff "gets a once a week access to the

phone," but he cannot use the phone if he is on loss of privileges status.  (*Id.*) Moreover, the phone "is brought up to the cell, with none on the yard like in [general population]."  (*Id.*)  Plaintiff must use a "segregation razor" that provides "diminished performance."  (*Id.*) An inmate in the Start Program can only access the law and general libraries "through the same exact forms that segregation prisoners use." (*Id.*) Plaintiff can only receive callouts for healthcare and psychiatric services in the Start Program.  (*Id.*, PageID.50.)  Prisoners in the Start Program receive an "all or nothing" haircut.  (*Id.*)  While inmates in the Start Program can receive visits, they are "separated by a viewing glass [with] no contact, food, or pictures."  (*Id.*)

### G.    Asserted Claims and Relief Sought

Based upon the foregoing, Plaintiff states that he is raising the following claims for relief: (1) Eighth Amendment claims premised upon the use of excessive force, deliberate indifference to medical needs, and sexual assault; (2) Fourteenth Amendment due process claims premised upon the issuance of false misconducts and violations of MDOC policy and procedure; and (3) claims for assault and battery, as well as negligence, under Michigan state law.  (*Id.*, PageID.35.)  Plaintiff's complaint can also be construed to assert First Amendment retaliation and access to the courts claims; constitutional claims regarding the handling, processing, and rejection of his grievances; Fourteenth Amendment claims regarding the taking of his property; and constitutional claims regarding his placement in the Start Program at ICF.  Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.  (*Id.*, PageID.36–37.)

21

## II.    Pending Motions

### A.    Motion to Appoint Counsel

Plaintiff has filed a motion to appoint counsel to represent him in this matter. (ECF No. 2.)  Plaintiff avers that counsel is necessary because the MDOC has tampered with his incoming and outgoing legal mail.  (ECF No. 2-1, PageID.55.) Plaintiff also suggests that he has been denied legal supplies and law library access. (*Id.*)

Indigent parties in civil cases have no constitutional right to a court-appointed attorney.  *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993).  The Court may, however, request an attorney to serve as counsel, in the Court's discretion.  *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances.  In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel.  *See Lavado*, 992 F.2d at 606.  The Court has carefully considered these factors and determines that, at this stage of the case, the assistance of counsel does not appear necessary to the proper presentation of Plaintiff's position.  The Court, therefore, will deny Plaintiff's motion to appoint counsel (ECF No. 2).

## B.    Motion for a Preliminary Injunction

Plaintiff has filed a motion for a preliminary injunction in this matter. (ECF No. 4.) Plaintiff seeks preliminary injunctive relief in the form of an order directing Defendants to release him from segregation and to provide immediate health services. (ECF No. 4-2, PageID.73.)

Preliminary injunctions are "one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). The issuance of preliminary injunctive relief is committed to the discretion of the district court. *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000). In exercising that discretion, a court must consider whether a plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Nader*, 230 F.3d at 834. These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also S. Galzer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) ("[T]hese are factors to be balanced, not prerequisites to be met."); *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013) (same); *Ne. Ohio Coal.*, 467 F.3d at 1009 (same); *Nader*, 230 F.3d at 834 (same). "But even the strongest showing on the other

three factors cannot 'eliminate the irreparable harm requirement.'" *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).

Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Glover v. Johnson*, 855 F.2d 277, 286 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432, 438 & n.3 (6th Cir. 1984). The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). Preliminary injunctions are not favored, and a movant is not necessarily entitled to such relief, even if the movant has shown likelihood of success on the merits. *Benisek v. Lamone*, 585 U.S. 155, 158 (2018).

Plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his § 1983 action. *NAACP v. City of Mansfield, Ohio*, 866 F.2d 162, 167 (6th Cir. 1989). Here, Plaintiff has not made such a showing. Additionally, a plaintiff's harm from the denial of a preliminary injunction is irreparable only if it is not fully compensable by monetary damages. *Overstreet*, 305 F.3d at 578. Plaintiff has failed to assert factors that establish that he will suffer irreparable harm in the absence of an injunction.

Finally, in the context of a motion impacting matters of prison administration, the interests of identifiable third parties and the public at large weigh against the granting of an injunction.  Any interference by the federal courts in the administration of state prison matters is necessarily disruptive.  The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights.  *Glover*, 855 F.2d at 286–87.  Here, Plaintiff has not made that showing.  Accordingly, for the foregoing reasons, Plaintiff's motion for a preliminary injunction (ECF No. 4) will be denied.

### C.    Motion to Change Venue

Plaintiff has also filed a "motion for change of venue to another state." (ECF No. 5.)  Plaintiff indicates that he previously filed a judicial complaint arguing that the judges of this Court are "unconstitutionally bias[ed] against Michigan *pro se* prisoner[s]." (ECF No. 5-1, PageID.77.)  Plaintiff "believe[s] one hundred percent that [he] could never, ever receive a fair and/or true court access as it now stands." (*Id.*)

Under the revised venue statute, venue in federal-question cases lies in the district in which any defendant resides or in which a substantial part of the events or omissions giving rise to the claim occurred.  28 U.S.C. § 1391(b).  Here, the events underlying Plaintiff's complaint all occurred within counties located in the Western District of Michigan.  *See* 28 U.S.C. § 102(b).  All of the named Defendants are public officials serving in those counties, and they "reside" in those counties for purposes of venue over a suit challenging official acts, *see Butterworth v. Hill*, 114 U.S. 128, 132 (1885); *O'Neill v. Battisti*, 472 F.2d 789, 791 (6th Cir. 1972).  Accordingly, venue is proper in this judicial district.  Moreover, as set forth herein, the Court has considered

the merits of the numerous claims raised in Plaintiff's complaint. The Court, therefore, will deny Plaintiff's motion to change venue (ECF No. 5).

### D.    Motion to Expedite

Plaintiff has also filed a motion to expedite. (ECF No. 6.) Plaintiff seeks expedited consideration of his complaint for the following reasons: (1) he is in imminent danger due to various health issues; (2) he faces irreparable harm from an "unconstitutional segregation stay"; and (3) he has filed a proper motion for preliminary injunction. (*Id.*, PageID.81.) The Court will grant Plaintiff's motion to expedite to the extent that this opinion constitutes the Court's screening of Plaintiff's complaint.

### E.    Motion for Relief from Judgment

Plaintiff has filed a motion for relief from judgment, asking for "the orders to be removed in Case N[umbers] 2:17-cv-160, 2:18-cv-92, 2:18-cv-70, 2:18-cv-81 [through] and beyond to 2:19-cv-59." (ECF No. 7, PageID.83.) Plaintiff essentially contends that the Court erred in dismissing these cases, and that he is reasserting the allegations in his instant complaint. Plaintiff's motion for relief from judgment is misplaced. Plaintiff cannot file a motion in the instant action seeking to reopen several other actions that have been closed for several years. For that sole reason, the Court will deny Plaintiff's motion for relief from judgment (ECF No. 7).

### F.    Motion to Notice Actual Claim/Pleading

Plaintiff has also filed what he calls a "motion to notice actual claim/pleading." (ECF No. 11.) In that motion, Plaintiff "hopes this Court actually look[s] at and takes serious his pleading." (*Id.*, PageID.98.) Plaintiff suggests that this Court is

unconstitutionally biased against *pro se* prisoners and has "created a host of unconstitutional tactics to defeat litigation [that have] been applied on record to Plaintiffs in the past." (ECF No. 11-1, PageID.100.)  While the Court disagrees with Plaintiff's suggestion that this Court uses unconstitutional tactics to defeat *pro se* prisoner litigation, the Court will grant Plaintiff's motion (ECF No. 11) to the extent that the Court has considered the claims raised in Plaintiff's *pro se* complaint in this opinion.

### G.    Motion to Allow Access to the Courts

Plaintiff has also filed what he calls a "motion to allow access to the courts." (ECF No. 12.)  Plaintiff essentially suggests that this Court has denied him access to the courts by delaying consideration of his complaint, despite the fact that he filed a motion for preliminary injunction.  (ECF No. 12-2, PageID.106.)  Plaintiff predicts that "no matter what is alle[]ged and can be proven," this Court will not dismiss his complaint on the merits, but "by an intentional ABC Avoidance Tactic."  (*Id.*, PageID.107.)  Again, while the Court disagrees with Plaintiff's suggestion that this Court has deliberately delayed consideration of his complaint, the Court will grant Plaintiff's motion (ECF No. 12) to the extent that the Court has considered the claims raised in Plaintiff's *pro se* complaint in this opinion.

### H.    Motion for Leave to Proceed *In Forma Pauperis*

Plaintiff has also filed a motion for leave to proceed *in forma pauperis* in this matter.  (ECF No. 13.)  As noted *supra*, however, Plaintiff has already paid the full filing fee for this case.  At this time, Plaintiff does not identify any additional costs he is required to, but unable to, pay.  Accordingly, his motion for leave to proceed *in*

*forma pauperis* (ECF No. 13) will be denied without prejudice to renewal of the motion if Plaintiff becomes liable for costs that he is unable to pay.

## III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.    Official Capacity Claims

Plaintiff indicates that he is suing all Defendants in their official capacities. (Compl., ECF No. 1, PageID.3.)

A suit against an individual in his or her official capacity is equivalent to a suit against the governmental entity; in this case, the MDOC. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). The states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity, or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). And, regardless, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v.*

29

*Bd. of Regents*, 535 U.S. 613, 617 (2002) (citing *Will*, 491 U.S. at 66); *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013).

As set forth above, Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.  (Compl., ECF No. 1, PageID.36–37.)  However, as noted above, the MDOC is not a "person" who may be sued under § 1983 for money damages.  *See Lapides*, 535 U.S. at 716.  Similarly, Plaintiff may not seek monetary damages against Defendants in their official capacities.  *Will*, 491 U.S. at 71 ("We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.").

Although damages claims against official capacity defendants are properly dismissed, an official capacity action seeking prospective injunctive or declaratory relief is not treated as an action against the state.  *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)).  The *Ex parte Young* doctrine "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign immunity purposes."  *Virginia Ofc. for Prot. and Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (internal citation omitted.")  The Supreme Court has cautioned that, "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Plaintiff is currently incarcerated at ICF, and he avers that the named Defendants are employed at four MDOC facilities: ICF, URF, AMF, and MBP.  The Sixth Circuit has held that transfer to another correctional facility moots a prisoner's injunctive and declaratory claims.  *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (holding that a prisoner-plaintiff's claims for injunctive and declaratory relief became moot when the prisoner was transferred from the prison about which he complained); *Mowatt v. Brown*, No. 89-1955, 1990 WL 59896 (6th Cir. May 9, 1990); *Tate v. Brown*, No. 89-1944, 1990 WL 58403 (6th Cir. May 3, 1990); *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991).  Here, Plaintiff is no longer confined at URF, AMF, and MBP, which is where most of the named Defendants are employed.  Thus, Plaintiff cannot maintain his claims for declaratory and injunctive relief against the URF, AMF, and MBP Defendants (all named Defendants except Defendants Bonn, Gifford, Siyiema, Cyphers, Miranka, and Smith).

With respect to the ICF Defendants (Defendants Bonn, Gifford, Siyiema, Cyphers, Miranka, and Smith), Plaintiff does not set forth any specific requests for declaratory or injunctive relief against them.  (*See* Compl., ECF No. 1, PageID.36.) Instead, Plaintiff focuses those requests for relief against Defendants Libby, Thompson, Bender, Larson, Woods, Niemi, Gongreua, Nepal, Huss, Pertu, Oh, Hill, Jeffries, Dalotti, Meals, Duecetti, Sunberg, Lee, Capello, White, Morgan, Deforge, Cirrio, and Kirchoffer.  (*Id.*)  For that reason alone, Plaintiff fails to state a claim against Defendants Bonn, Gifford, Siyiema, Cyphers, Miranka, and Smith in their official capacities.

Plaintiff does seek injunctive relief against Defendants Huss and Taskilea in the form of release from punitive segregation and placement in general population, and he seeks injunctive relief against Defendants Oh, Hill, Jeffries, or Sunberg in the form of the provision of health services, the COVID-19 vaccine, and the annual tuberculosis test. (*Id.*) As set forth *supra*, Plaintiff equates his current placement in ICF's Start Program to segregation, and he also suggests that staff at ICF have continued to deny him the tuberculosis test as well as healthcare. (*Id.*, PageID.25.) In light of those allegations, the Court will generously construe Plaintiff's complaint as asserting claims for prospective declaratory and injunctive relief against the ICF Defendants (Defendants Bonn, Gifford, Siyiema, Cyphers, Miranka, and Smith). However, before allowing Plaintiff to proceed upon those claims, the Court must consider whether Plaintiff has set forth any plausible claim for relief.

### B.    Merits of Plaintiff's Claims

#### 1.    Claims Barred By the Statute of Limitations

As set forth *supra*, Plaintiff's factual allegations span a period of time from January 29, 2013, until presumably the present, given Plaintiff's suggestion that he is currently being subjected to unconstitutional conditions in ICF's Start Program. As discussed below, the majority of Plaintiff's claims for relief appear to be barred by the statute of limitations.

State statutes of limitations and tolling principles apply to determine the timeliness of claims asserted under 42 U.S.C. § 1983. *Wilson v. Garcia*, 471 U.S. 261, 268–69 (1985).  For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years.  *See* Mich. Comp. Laws § 600.5805(2); *Carroll v. Wilkerson*,

782 F.2d 44, 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). Accrual of the claim for relief, however, is a question of federal law. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer*, 98 F.3d at 220.[2]

Under the prison mailbox rule, an incarcerated plaintiff's complaint is deemed filed on the date that it is handed to a prison official for mailing to the court. *See Richard v. Ray*, 290 F.3d 810 812–13 (6th Cir. 2002) (extending the rule set forth in *Houston v. Lack*, 487 U.S. 266 (1988), to civil matters). "[A]bsent contrary evidence," courts presume that this occurs on the date the complaint is signed by the plaintiff. *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008). Here, Plaintiff has signed his complaint and dated it as of June 11, 2025. (Compl., ECF No. 1, PageID.37, 40, 41, 43, 46, 50.) The Court, therefore, will deem June 11, 2025, as the date on which Plaintiff filed the instant complaint.

In light of that conclusion, any claims for relief based upon events that occurred from June 11, 2022, until June 11, 2025, are timely. With respect to any claims regarding events that occurred before June 11, 2022, Plaintiff had reason to know of

---

[2] 28 U.S.C. § 1658 created a "catch-all" limitations period of four years for civil actions arising under federal statutes enacted after December 1, 1990. The Supreme Court's decision in *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004), which applied this federal four-year limitations period to a suit alleging racial discrimination under § 1981 does not apply to prisoner claims under 42 U.S.C. §1983 because, while § 1983 was amended in 1996, prisoner civil rights actions under § 1983 were not "made possible" by the amended statute. *Id.* at 382.

the "harms" done to him at the time they occurred. Hence, his claims accrued on those dates. Thus, given that Plaintiff placed his complaint in the prison mailing system on June 11, 2025, any claims that accrued prior to June 11, 2022, have been asserted well past Michigan's three-year limit. Michigan law no longer tolls the running of the statute of limitations when a plaintiff is incarcerated. *See* Mich. Comp. Laws § 600.5851(9). Further, it is well established that ignorance of the law does not warrant equitable tolling of a statute of limitations. *See Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991); *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991); *Mason v. Dep't of Justice*, No. 01-5701, 2002 WL 1334756, at *2 (6th Cir. June 17, 2002).

The Court recognizes that for actions, like this one, that are subject to the PLRA, "the statute of limitations 'is tolled while the plaintiff exhausts his required administrative remedies.'" *Heid v. Warden*, No. 23-3367, 2024 WL 1212829, at *2 (6th Cir. Mar. 21, 2024) (quoting *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012)). Throughout his complaint, Plaintiff references the fact that his grievances were either denied, ignored, or taken from his cell by officers to thwart Plaintiff's ability to exhaust his administrative remedies. Plaintiff also references being placed on a modified access grievance restriction in 2018, and that all of his requests to file grievances thereafter were denied. Essentially, Plaintiff contends that the administrative remedy process was rendered unavailable due to Defendants' actions. (Compl., ECF No. 1, PageID.42.)

The Supreme Court has noted three circumstances in which an administrative remedy process can be rendered unavailable for purposes of the PLRA. First, a procedure is unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross v. Blake*, 578 U.S. 632, 643 (2016). Second, a procedure "might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, a procedure is rendered unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

However, even if Michigan's administrative remedy process was rendered unavailable to Plaintiff due to the reasons set forth above, his claims that accrued prior to June 11, 2022, would still be untimely. If the grievance process is unavailable to an inmate, the administrative remedy process is, therefore, deemed to be complete. *See Gibbs v. Zook*, No. 1:24-cv-1385-JEH, 2025 WL 1603909, at *2 (C.D. Ill. Feb. 21, 2025) (citing *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)). Quite simply, if an administrative remedy is unavailable to an inmate, that inmate "would not be entitled to any equitable tolling while he exhausted his administrative remedies." *Jones v. City of New York*, 571 F. Supp. 3d 118. 129 (S.D.N.Y. 2021). Accordingly, given Plaintiff's representations that Michigan's administrative remedies were rendered unavailable to him by, at the latest, 2018, Plaintiff is not entitled to have the limitations period tolled while he exhausted his remedies.

Plaintiff also contends that he "can recover for the whole cause of conduct even if it started [before] the limitations period" expired due to the continuing violation doctrine.  (Compl., ECF No. 1, PageID.48.)   In support of that argument, Plaintiff cites *Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001).  In *Heard*, the United States Court of Appeals for the Seventh Circuit concluded that the "federal doctrine of continuing wrongs is indeed applicable to suits under 42 U.S.C. § 1983."  *See id.* at 320.  The Seventh Circuit noted that a violation is continuing "when it would be unreasonable to require or even permit [the plaintiff] to sue separately over every incident of the defendant's unlawful conduct."  *See id.* at 319.

*Heard*, as a Seventh Circuit case, is not binding upon this Court, as this Court is bound by Sixth Circuit precedent.  The Sixth Circuit has held that "[a] 'continuous violation' occurs, and will extend the limitations period, if the defendants engages in continuing wrongful conduct; injury to the plaintiff accrues continuously; and had the defendant at any time ceased its wrongful conduct, further injury would have been avoided."  *Goldsmith v. Sharrett*, 614 F. App'x 824, 827 (6th Cir. 2015).  Notably, however, the Sixth Circuit stated that this doctrine "applies most frequently in the context of Title VII cases, and is rarely extended to § 1983 actions."  *See id.* at 828 (citing *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003)).

In light of the foregoing, the Court declines to extend the continuing violation doctrine to Plaintiff's instant complaint.  Notably, between 2013 and 2022, Plaintiff was incarcerated in three different facilities—URF, MBP, and AMF.  The fact that Plaintiff was incarcerated in three separate facilities during this time undercuts an

36

argument that any one Defendant engaged in continuing wrongful conduct such that the limitations period would be tolled on that basis.   Moreover, while Plaintiff suggests that he has been held in segregation for years, Plaintiff references a series of discrete dates on which the decision to keep him in segregation was renewed.  Quite simply, Plaintiff "fails to allege that a violation of his rights occurred over several incidents that were not individually identifiable."   *See Nellson v. Fed. Bureau of Prisons*, No. 20-65-DLB, 2021 WL 4478149, at *3 (E.D. Ky. Sept. 29, 2021).  Plaintiff, therefore, cannot rely on the continuing violation doctrine to render timely his claims concerning events that accrued before June 11, 2022.

Finally, the Court recognizes that Michigan law tolls the statute of limitations while a claim is pending in court.  *See* Mich. Comp. Laws § 600.5856.  Recently, the Sixth Circuit concluded that Michigan's tolling provision is not inconsistent with the PLRA.  *See Heard v. Strange*, 127 F.4th 630, 634 (6th Cir. 2025).  The Sixth Circuit noted that Michigan's law did not affect the PLRA's requirement regarding exhaustion, and that "using state law tolling rules is consistent with history and tradition." *Id.*

However, even giving Plaintiff the benefit of tolling pursuant to Mich. Comp. Laws § 600.5856, any of Plaintiff's claims that accrued prior to June 11, 2022, are still untimely.  As noted *supra*, Plaintiff is a well-known filer in this Court. Prior to the instant action, Plaintiff had filed 60 separate civil rights actions in this Court. Out of those 50, all but 10 were filed in the years 2018 and 2019.  Plaintiff also filed one action in 2020.   The majority of Plaintiff's actions were dismissed without

prejudice for Plaintiff's failure to pay the full filing fee after the Court concluded that Plaintiff had not demonstrated imminent danger of serious physical harm to allow him to proceed *in forma pauperis*.  Nevertheless, even if some of the claims Plaintiff now raises are the same as claims he raised in those lawsuits, and even giving him the benefit of tolling while those suits were pending, those claims are still untimely because almost five years have passed since 2020, when Plaintiff last filed a lawsuit in this Court.

In sum, Plaintiff's claims that accrued prior to June 11, 2022, are untimely.  A claim barred by the statute of limitations is subject to dismissal for failure to state a claim.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007) ("If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim . . . ."); *see also Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (holding that if, on the face of a complaint, the allegations show that relief is barred by an affirmative defense (lack of exhaustion), the complaint is subject to dismissal for failure to state a claim) (citing *Jones*, 549 U.S. at 215); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (when a complaint on its face is barred by the statute of limitations, it fails to state a claim).  Thus, for the foregoing reasons, the Court will dismiss all of Plaintiff's claims that accrued prior to June 11, 2022, as untimely.

### 2.    Timely Claims for Relief

The Court's conclusion that all of Plaintiff's claims that accrued prior to June 11, 2022, are subject to dismissal as untimely leaves very few claims for the Court to consider on the merits.  The Court's generous construction of Plaintiff's complaint

suggests that the following claims are timely: (1) Plaintiff's First and Fourteenth Amendment claims against Defendants Pertu, Beeseley, Haataja, Bauman, Wilson, Niemi, and Kowalski concerning denial of access to the courts and the taking of various legal documents; (2) constitutional claims against Defendants Pertu and Kowalski concerning interference with outgoing legal mail to an attorney; (3) Plaintiff's First and Fourteenth Amendment access to the courts and taking of property claims regarding events that occurred at ICF; (4) constitutional claims concerning Plaintiff's placement on modified access grievance restriction at ICF; (5) Plaintiff's Eighth Amendment claims concerning the denial of healthcare: and (6) constitutional claims regarding Plaintiff's placement in the Start Program at ICF.

### a.    First Amendment Access to the Courts

Plaintiff contends that in January of 2023, he tried to send a copy of the instant complaint to this Court and the Eastern District of Michigan. (Compl., ECF No. 1, PageID.12.) However, on January 3, 2023, Defendants Pertu, Beeseley, Haataja, and Bauman came to Plaintiff's cell, and Defendant Pertu said, "We need to shake you down." (*Id.*, PageID.13.) Plaintiff complied, and when he returned to his cell, he found that his expedited legal mail forms were missing. (*Id.*) Plaintiff claims that in the following weeks, Defendants Beeseley, Haataja, and Bauman admitted to removing the forms. (*Id.*)

Plaintiff tried to send an updated copy of his complaint on April 7, 2023, but Defendant Wilson refused to send the mail, stating that Defendant Pertu ordered him not to. (*Id.*) Plaintiff waited until Defendant Pertu was off, and he attempted to mail the complaint again on two separate occasions in October of 2023. (*Id.*) Defendants

Niemi and Wilson received the legal mail.  (*Id.*)  Plaintiff claims that he learned from a family member that neither lawsuit had been filed.  (*Id.*)

Plaintiff mentions that on October 20, 2023, Defendant Pertu directed Defendant Kowalski to hold and open legal mail that Plaintiff was sending to an attorney.  (*Id.*, PageID.14.)  Plaintiff claims that after sending kites to the mail room, he received a copy of the expedited legal mail form on October 25, 2023.  (*Id.*, PageID.15.)  Plaintiff noticed that the date and time for receipt by staff had been changed from October 20, 2023, to October 30, 2023.  (*Id.*)

Plaintiff tried to send an updated version of Case No. 2:18-cv-92 to this Court on four separate occasions in early 2024, but claims the cases were not filed.  (*Id.*)  Plaintiff was transferred to ICF on April 30, 2024.  (*Id.*)  After his transfer, he tried to send the updated version of Case No. 2:18-cv-92 on May 1, 2024, June 1, 2024, and July 1, 2024, but claims that the cases were not filed.  (*Id.*)  Plaintiff also sent a motion for reconsideration each time he tried to mail the complaint, as well as updated complaints for several other cases; those motions were also not filed.  (*Id.*)  Plaintiff claims that several appeals that he sent to the United States Court of Appeals for the Sixth Circuit were also not filed by that court.  (*Id.*)

To state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury."  *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000.  In other words, a plaintiff must plead that the defendants' actions have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim.  *Lewis*, 518 U.S.

at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).  The
Supreme Court has strictly limited the types of cases for which there may be an actual
injury:

> *Bounds* does not guarantee inmates the wherewithal to transform
> themselves into litigating engines capable of filing everything from
> shareholder derivative actions to slip-and-fall claims. The tools it
> requires to be provided are those that the inmates need in order to
> attack their sentences, directly or collaterally, and in order to challenge
> the conditions of their confinement. Impairment of any other litigating
> capacity is simply one of the incidental (and perfectly constitutional)
> consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355.  "Thus, a prisoner's right to access the courts extends to direct
appeals, habeas corpus applications, and civil rights claims only."  *Thaddeus-X v.
Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc).  Moreover, the underlying action
must have asserted a non-frivolous claim.  *Lewis*, 518 U.S. at 353; *accord Hadix v.
Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis* changed actual injury to include
requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause
of action . . . is an element that must be described in the complaint, just as much as
allegations must describe the official acts frustrating the litigation."  *Christopher v.
Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3).  "Like any
other element of an access claim, the underlying cause of action and its lost remedy
must be addressed by allegations in the complaint sufficient to give fair notice to a
defendant."  *Id.* at 415.

Plaintiff's allegations, as set forth above, are not sufficient to plausibly allege First Amendment access to the courts claims. First, with respect to Plaintiff's assertion that he was hindered from filing the instant complaint in 2023, Plaintiff was ultimately able to file this complaint on June 11, 2025. With respect to the incident in October of 2023, Plaintiff provides no facts regarding the nature of the mail that he was attempting to send to an attorney. Finally, while Plaintiff suggests that he tried to mail an updated version of his complaint that had been filed in Case No. 2:18-cv-92, as well as updated complaints and motions for reconsideration in other cases, Plaintiff fails to set forth any facts suggesting that those actions asserted non-frivolous claims for relief. Notably, Case No. 2:18-cv-92 was ultimately dismissed without prejudice on September 28, 2020, after the Court revoked Plaintiff's *in forma pauperis* status and directed him to pay the full filing fee within 28 days. *See* Order and J., *Theriot v. Woods et al.*, No. 2:18-cv-92 (W.D. Mich.) (ECF Nos. 125, 126). Plaintiff provides no facts regarding the nature of the "updated complaints" and motions for reconsideration that he attempted to file, nor does he explain how these various documents would have revived his many previous lawsuits, particularly given the fact that the majority of them were dismissed without prejudice given Plaintiff's failure to pay the full filing fees. Furthermore, while Plaintiff states, in a conclusory fashion, that he was unable to file several appeals to the Sixth Circuit, Plaintiff provide no facts regarding the issues that he wished to raise on appeal.

Nor does Plaintiff describe any lost remedy. As noted above, the majority of Plaintiff's prior lawsuits were dismissed for Plaintiff's failure to pay the full filing

fees after being denied leave to proceed *in forma pauperis*.  Plaintiff does not set forth any facts suggesting that he had the means to pay those fees and was thwarted from doing so by any of the named Defendants.  Likewise, if an earlier filing date may have avoided the statute of limitations problems for any claims that accrued prior to June 11, 2022, Plaintiff fails to show how he would have overcome the bar of 28 U.S.C. § 1915(g).  Furthermore, Plaintiff has not—and cannot—set forth any lost remedy regarding the instant complaint given that this Court is considering the claims set forth therein in this opinion.

Accordingly, for the foregoing reasons, the Court will dismiss Plaintiff's timely First Amendment access to the courts claims for failure to state a claim upon which relief can be granted.

### b.    Fourteenth Amendment Deprivation of Property Claims

Plaintiff's allegations suggesting that his legal documents were taken out of his cell can also be construed as asserting Fourteenth Amendment due process claims premised upon the deprivation of property.

Such claims, however, are barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986).  Under *Parratt*, an individual deprived of property by a "random and unauthorized act" of a state employee cannot maintain a federal due process claim unless the state fails to afford an adequate post-deprivation remedy.  If an adequate post-deprivation remedy exists, the deprivation, while real, is not "without due process of law."  *Id.* at 537. This doctrine applies to both negligent and intentional deprivations of property, as

long as the deprivation was not pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530–36 (1984). Plaintiff must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479–80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). The Sixth Circuit has noted that a prisoner's failure to sustain this burden requires dismissal of his § 1983 due process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Here, Plaintiff fails to allege that his state post-deprivation remedies are inadequate. Plaintiff has available to him numerous state post-deprivation remedies. The Sixth Circuit has specifically held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff fails to allege any reasons why a state-court action would not afford him complete relief for the deprivations, either negligent or intentional, of his personal property.

Accordingly, any Fourteenth Amendment procedural due process claims premised upon the deprivation of Plaintiff's legal property will be dismissed.

### c.     Interference with Outgoing Legal Mail

Plaintiff mentions that on October 20, 2023, Defendant Pertu directed Defendant Kowalski to hold and open legal mail that Plaintiff was sending to an attorney. (*Id.*, PageID.14.) Plaintiff claims that after sending kites to the mail room, he received a copy of the expedited legal mail form on October 25, 2023. (*Id.*, PageID.15.) Plaintiff noticed that the date and time for receipt by staff had been changed from October 20, 2023, to October 30, 2023. (*Id.*) The Court has construed

44

these allegations to raise constitutional claims regarding interference with Plaintiff's outgoing legal mail.

In *Sallier v. Brooks*, 343 F.3d 868, 873–74 (6th Cir. 2003), the Sixth Circuit considered multiple potential sources of protection for legal mail, including the Sixth Amendment right to counsel, the First Amendment right to petition for redress of grievances, the First Amendment right of access to the courts, and the prisoner's general interest in protecting the attorney-client privilege. Simply calling a particular correspondence "legal mail," however, does not implicate each and every one of those protections. For example, the Sixth Amendment right to counsel applies only to criminal prosecutions. *Wolff v. McDonnell*, 418 U.S. 539, 576–77 (1974) ("As to the Sixth Amendment, its reach is only to protect the attorney-client relations in the criminal setting . . . ."); *see also Stanley v. Vining*, 602 F.3d 767, 770 (6th Cir. 2010). Here, Plaintiff alleges no facts supporting the inference that the mail in question was to an attorney representing Plaintiff in a criminal proceeding. Likewise, Plaintiff has alleged no facts suggesting that the mail in question bore any relationship to a direct appeal of any criminal convictions, a habeas corpus application, or a civil rights claim.

Further, the ability of a prisoner "to receive materials of a legal nature" related to his legal rights and concerns itself implicates a fundamental right. *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996). Courts have, therefore, extended protections to prisoners' legal mail that do not exist for general mail. However, not all outgoing and

incoming mail constitutes "legal mail," and "the question of what constitutes 'legal mail' is a question of law." *Sallier*, 343 F.3d at 871.

The Sixth Circuit Court of Appeals has looked to the definition in the Michigan Administrative Code when considering whether mail sent to or from a prisoner incarcerated with the MDOC is "legal mail." *See, e.g.*, *Jones v. Caruso*, 569 F.3d 258, 268 (6th Cir. 2009) (noting that the "Michigan Administrative Code defines 'legal mail' as correspondence with courts, attorneys, public officials, the office of the legislative corrections ombudsman, the department of correction's central office staff, and staff of the institution in which the prisoner is incarcerated. *See* Mich. Admin. Code R. 791.6603(7) (Nov. 15, 2008)"); *Muhammad v. Pitcher*, 35 F.3d 1081, 1083 (6th Cir. 1994) (looking to the Michigan Administrative Code for the definition of "legal mail" in Michigan). Moreover, "the determination of whether mail is considered legal mail depends not only on the nature of the sender, but on the appearance of the mail [as well as] the nature of the contents." *Longmire v. Mich. Dep't of Corr.*, 454 F. Supp. 3d 702, 708 (W.D. Mich. 2020), *aff'd*, No. 20-1389, 2021 WL 5352809, at *2 (6th Cir. June 9, 2021) (noting that "the mail must be 'properly and clearly marked as legal materials,'" and "while the envelope states that it is confidential, it was not, as the district court held, 'clearly marked as legal mail,' nor did it have the Commission's name on it or other salient information, such as 'the name and bar number of a licensed attorney'" (citation omitted)).

Here, Plaintiff alleges only in a conclusory fashion that he was attempting to send mail to an attorney on one occasion. Plaintiff provides no facts regarding the

nature of that communication that he was allegedly thwarted from sending.  In any event, "isolated instances of interference with prisoners' mail" do not rise to the level of a constitutional violation under the First Amendment.  *See Johnson v. Wilkinson*, No. 98-3866, 2000 WL 1175519 (6th Cir. Aug. 11, 2000) (citing *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997) (holding that an "isolated incident, without any evidence of improper motive or resulting interference with [the inmate's] right to counsel or to access to the courts, does not give rise to a constitutional violation.")); *Colvin v. Caruso*, 605 F.3d 282, 293 (6th Cir. 2010) (citing *Johnson* for the holding that "isolated incidents" of interference with prisoners' rights do not rise to the level of a First Amendment violation); *Okoro v. Scibana*, 63 F. App'x 182, 184 (6th Cir. 2003) (stating "Okoro was only able to provide one specific incident where he allegedly did not receive the full contents of a letter from his wife.  Such a random and isolated incident is insufficient to establish a constitutional violation.").  Indeed, the Sixth Circuit has relied upon *Colvin* to confirm that a single isolated event of tampering with legal mail "does not rise to the level of a constitutional violation."  *See Smith v. Goostrey*, No. 23-1025, 2023 WL 5024659, at *3 (6th Cir. Aug. 4, 2023).

Here, Plaintiff's inability to send mail to an attorney on one occasion appears to have been an isolated occurrence.  Thus, any constitutional claims premised upon interference with Plaintiff's outgoing legal mail will be dismissed.

### d.    Placement    on    Modified    Access    Grievance Restriction

The Court has also construed Plaintiff's complaint to assert constitutional claims premised upon his placement on grievance restriction after his transfer to ICF.

47

As an initial matter, Plaintiff has not set forth any facts suggesting that any of the named ICF Defendants (Defendants Bonn, Gifford, Siyiema, Cyphers, Miranka, and Smith) were personally responsible for Plaintiff's placement on grievance restriction.  In any event, Plaintiff's placement on grievance restriction did not violate his rights under the First Amendment.  "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact."  *Griffin v. Berghuis*, 563 F. App'x 411, 415–16 (6th Cir. 2014) (citing *N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)).  Plaintiff had other means of exercising his right to petition government for redress of grievances.  Indeed, Plaintiff's ability to seek redress is underscored by his *pro se* invocation of the judicial process.  *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982).

Moreover, Plaintiff was not wholly denied access to the grievance process.  Placement on modified access does not prohibit an inmate from utilizing the grievance process.  *See Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445–47 (6th Cir. 2005); *Corsetti v. McGinnis*, 24 F. App'x 238, 241 (6th Cir. 2001).  The inmate may still request a grievance form and, if the form is provided, submit grievances to the grievance coordinator, who reviews the grievance to determine whether it complies with institutional rules regarding the filing of grievances.  *See* MDOC Policy Directive 03.02.130 ¶ SS (eff. Oct. 21, 2024).  Moreover, if a prisoner submits a grievance obtained from a source other than the Step I grievance coordinator, the

grievance coordinator may reject the grievance, in accordance with ¶ P of the policy. *Id.* ¶¶ P(3), SS.  As with any grievance rejection under ¶ P, the prisoner may appeal the rejection to the next step of the grievance process. *Id.* ¶ O.  There is nothing constitutionally improper about this review process for a prisoner who has demonstrated an inability to properly utilize the grievance process in the past. Plaintiff's First Amendment claims regarding placement on grievance restriction will, therefore, be dismissed.

### e.    Denial of Medical and Mental Health Care

The Eighth Amendment obligates prison authorities to provide medical care, including mental health care, to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *Comstock v. McCrary*, 273 F.3d 693, 702–03 (6th Cir. 2001).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Estelle*, 429 U.S. at 104–05; *Comstock*, 273 F.3d at 702.  Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is

sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person."  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008).

Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear.  *See, e.g., Rouster v. Saginaw Cnty.*, 749 F.3d 437, 446–51 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks

omitted), *abrogation on other grounds recognized by Lawler as next friend of Lawler v. Hardiman Cnty., Tenn.*, 93 F.4th 919 (6th Cir. 2024).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835 "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence. . . A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842).

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105–06 (quotations omitted).  Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.  *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014).  This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering.  *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Id.*; *see also Rouster*, 749 F.3d at 448; *Perez v. Oakland Cnty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440–41 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).  "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'"  *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  He must

demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

### (i)    Objective Component

Plaintiff contends that he suffers from blood in his feces, which Plaintiff speculates "could be hepatitis C or worse and could lead to a coma or death." (Compl., ECF No. 1, PageID.31.)  Plaintiff avers that the annual tuberculosis screening could reveal if he has hepatitis C, but that he has been denied this screening.  (*Id.*, PageID.25, 31.)  Plaintiff mentions not receiving dental and optometry services.  (*Id.*, PageID.31, 33.)  He suffers from a pinched nerve in his back.  (*Id.*, PageID.34.)

Plaintiff also mentions several other health issues, including: (1) untreated cavities and tooth infection; (2) a rash on his right leg; (3) painful toenail fungus; (4) a painful cyst on the back of his right wrist; and (5) varicose veins. (*Id.*) Plaintiff speculates that he may have developed other ailments due to the lack of healthcare. (*Id.*)  Plaintiff contends that he needs to be tested for tuberculosis, heart disease, high blood pressure, and diabetes.  (*Id.*)  Plaintiff also mentions that he needs a new pair of glasses, as well as a new pair of "TED hose."  (*Id.*)  Plaintiff avers that he needs the flu and COVID-19 vaccines.  (*Id.*)

For purposes of this opinion, the Court concludes that the conditions that Plaintiff describes in his complaint satisfy the objective component of the relevant two-prong test.

### (ii)    Subjective Component

The Court now turns to the subjective component.  As set forth *supra*, the subjective component requires that a plaintiff alleges sufficient facts to show that "the official [or medical provider was] both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that the official or medical provider "also dr[e]w the inference." *Farmer*, 511 U.S. at 837.

Plaintiff claims that Defendants Oh, Hill, Jeffries, Meals, Dalotti, Sunberg, and Duecetti told Plaintiff that he would not receive healthcare services because of an order given by Defendant Niemi.  (*Id.*, PageID.31, 33.)  Plaintiff avers that when Defendant Niemi retired, Defendant Pertu "up[held] the order." (*Id.*, PageID.31.)  He alleges further that after he was transferred to ICF, Defendants Miranka and Smith told Plaintiff that he would not be receiving any mental health treatment, and that Defendants Siyiema and Cyphers told Plaintiff that he would not receive any healthcare treatment at all.  (*Id.*, PageID.25.)

Here, Plaintiff's allegations are simply too conclusory for purposes of the subjective component of his Eighth Amendment claims.  Although Plaintiff alleges in a conclusory manner that the Defendants named above denied him medical attention, Plaintiff does not set forth any facts indicating what objectively serious medical problems or symptoms he described to these individuals.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679. There is nothing alleged in the complaint that might distinguish a deliberate indifference to Plaintiff's needs from simple negligence,

which *Farmer* has held is not enough for an Eighth Amendment claim.  *See Farmer*, 511 U.S. at 835 (holding that an Eighth Amendment violation requires a "state of mind more blameworthy than negligence").  Accordingly, the Court will dismiss Plaintiff's Eighth Amendment claims premised upon the denial of medical care.

### f.    Claims Regarding the Start Program

The Court has construed Plaintiff's complaint to assert various constitutional claims regarding his placement in the Start Program at ICF.

As set forth *supra*, Plaintiff claims that in "Stage 0 Unit 2 [of the Start Program], [he] can only leave his cell in handcuffs escorted by two officers." (*Id.*, PageID.48.) Moreover, Plaintiff cannot order Secure Paks. (*Id.*, PageID.49.) In Stage 0 Unit 2, Plaintiff "gets a once a week access to the phone," but he cannot use the phone if he is on loss of privileges status. (*Id.*) Moreover, the phone "is brought up to the cell, with none on the yard like in [general population]." (*Id.*) Plaintiff must use a "segregation razor" that provides "diminished performance." (*Id.*) An inmate in the Start Program can only access the law and general libraries "through the same exact forms that segregation prisoners use." (*Id.*) Plaintiff can only receive callouts for healthcare and psychiatric services in the Start Program. (*Id.*, PageID.50.) Prisoners in the Start Program receive an "all or nothing" haircut. (*Id.*) While inmates in the Start Program can receive visits, they are "separated by a viewing glass [with] no contact, food, or pictures." (*Id.*)

### (i)    Eighth Amendment

First, Plaintiff's complaint can be construed as asserting an Eighth Amendment challenge to his placement in the Start Program.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous," nor may it contravene society',s "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998).

The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*,

511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).    The deliberate-indifference standard includes both objective and subjective components.  *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37.  To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.  Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety."  *Id.* at 837.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Id.* at 842.  "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."  *Id.* at 836.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.* at 844.

First, Plaintiff alleges that his placement in the Start Program is akin to segregation-like conditions.  However, placement in segregation, without more, is a routine discomfort that is "part of the penalty that criminal offenders pay for their offenses against society."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation.  *See Evans v. Vinson*, 427 F. App'x

437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008). Moreover, Plaintiff cannot bring an Eighth Amendment claim for emotional or mental damages because he does not allege any physical injury that arose from his placement in the Start Program.  *See* 42 U. S.C. § 1997e(e); *see also Hudson*, 503 U.S. at 5; *Harden-Bey*, 524 F.3d at 795.

Plaintiff also suggests that he cannot order Secure Paks while in the Start Program.  Per the MDOC's website, the Secure Pak program, also referred to as the Friends and Family program, "is a Department-approved customized package program that allows family members and others to send authorized items to prisoners while safeguarding against the introduction of contraband."  *See* https://www.michigan.gov/corrections/for-families/family-and-friends-securepak-program-how-it-works (last visited Aug. 20, 20925).  Prisoners are also permitted to directly order Secure Paks themselves.  *Id.*  However, prisoners in segregation are not eligible to receive Secure Paks.  *Id.*  Per MDOC policy, Start Now units are alternatives to administrative segregation.  *See* Director's Office Memorandum (DOM) 2024-4 (eff. Jan. 1, 2024).  Again, despite Plaintiff's suggestion that he cannot purchase Secure Paks, Plaintiff fails to set forth sufficient *facts* from which the Court could conclude that he was denied basic human needs and requirements from his inability to purchase such Paks.

Accordingly, for the foregoing reasons, any intended Eighth Amendment claims premised upon Plaintiff's placement in the Start Program and the conditions therein will be dismissed.

### (ii)    Due Process

Plaintiff's allegations concerning the Start Program can also implicate both procedural due process and substantive due process under the Fourteenth Amendment.

### a.    *Procedural Due Process*

"The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005).  To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

The United States Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976).  In *Sandin v. Conner*, the Supreme Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. 515 U.S. 472, 484 (1995).  According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 486–87; *see*

*also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).

Here, Plaintiff alleges that he was placed in ICF's Start Program in 2024 and continues to be held in that unit.  Plaintiff, however, does not allege that his placement in the Start Program affected the duration of his sentence.  Moreover, as explained below, Plaintiff has failed to allege facts to suggest that the Start Program is an atypical and significant deprivation.

The Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification.  *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum*, 427 U.S. at 228–29.  Furthermore, as noted above, Plaintiff describes the Start Program at ICF as akin to segregation.  With respect to an inmate's detention in segregation, generally only periods of segregation lasting for a year or more have been found to be atypical and significant.  *See, e.g.*, *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (concluding that thirteen years of segregation implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (finding that eight years of segregation implicates a liberty interest); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008) (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, i.e., three years without an explanation from prison officials, implicates a liberty interest).

Plaintiff was transferred to ICF on April 30, 2024.  Presuming that he was placed in the Start Program shortly after his transfer, Plaintiff has been in the Start Program for more than a year.  Although the length of Plaintiff's placement in the Start Now unit invariably implicates a liberty interest under the authority set forth above, Plaintiff fails to allege sufficient facts to suggest that his placement there is an atypical and significant deprivation.  *See, e.g.*, *Jackson v. Berean*, No. 1:18-cv-1075, 2019 WL 1253196, at *11 (W.D. Mich. Mar. 19, 2019) ("[The Start program], which is less restrictive on the whole than the administrative segregation at issue in *Sandin*, necessarily falls short of an atypical and significant hardship."), *aff'd*, No. 19-1583, 2019 WL 6208147 (6th Cir. Nov. 19, 2019); *Dickerson v. Davids*, No. 1:21-cv-401, 2021 WL 3928667, at *4 (W.D. Mich. Sept. 2, 2021).

In any event, while Plaintiff suggests that he has been forced to remain in segregation-like conditions, Plaintiff fails to set forth any facts suggesting that his continued placement in the Start Program has never been reviewed.  Even where a liberty interest is shown, the due process claim "is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990).  The Supreme Court has indicated that "[p]rison officials must engage in some sort of periodic review of the confinement of . . . inmates [in segregation]." *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983).  "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* However, the decision to continue confinement must be supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985).  "This requirement balances the

procedural rights of prisoner against the need of prison officials to have freedom to operate their facilities on a day-to-day basis." *Harris*, 465 F. App'x at 484.  In short, where an inmate's confinement in segregation implicates a liberty interest, he is entitled to a "periodic review of his confinement, supported by some evidence or indicia of reliability." *Id.* at 485; *see also Selby*, 734 F.3d at 559–60 (holding that the mere formality of holding reviews is not sufficient; whether a given process is meaningful and adequate is a question of fact).  Quite simply, Plaintiff's complaint is devoid of facts from which the Court could infer that these reviews have not occurred.

Accordingly, for the reasons set forth above, the Court will dismiss Plaintiff's Fourteenth Amendment procedural due process claims premised upon his placement in the Start Program.

### b.    *Substantive Due Process*

To the extent that Plaintiff intended to raise substantive due process claims, he fails to state such claims. "Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)).  Specifically, "[s]ubstantive due process 'prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).  "Conduct shocks the conscience if it 'violates the decencies of

civilized conduct.'" *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)).

Here, Plaintiff fails to set forth any facts from which the Court could infer conduct that is sufficiently outrageous to support a substantive due process claim. While it is clear that Plaintiff disagrees with his placement in the Start Program, his allegations fall short of showing the sort of egregious conduct that would support a substantive due process claim.

Furthermore, "[w]here a particular [a]mendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that [a]mendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273–75 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)) (holding that the Fourth Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens).  If such an amendment exists, the substantive due process claim is properly dismissed.  *See Heike v. Guevara*, 519 F. App'x 911, 923 (6th Cir. 2013).  Plaintiff's challenges to the conditions of confinement are protected by the Eighth Amendment, whereas his challenge to the length of his placement in the Start Program is protected by the Fourteenth Amendment's procedural due process clause.

Accordingly, for the reasons set forth above, any intended Fourteenth Amendment substantive due process claims premised upon Plaintiff's placement in the Start Program will be dismissed.

### (iii)   Equal Protection

Plaintiff's allegations concerning the Start Program can also implicate the Fourteenth Amendment's Equal Protection Clause.  That clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To state an equal protection claim, Plaintiff must show "intentional and arbitrary discrimination" by the state; that is, he must show that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).  Further, "'[s]imilarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'"  *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)).  Although Plaintiff contends that he is deprived of certain amenities because of his placement in the Start Program, Plaintiff's allegations fail to suggest that general population inmates are similar to inmates placed in the Start Program in all relevant aspects.  Instead, to the extent Plaintiff's allegations suggest discriminatory treatment, they are wholly conclusory.  Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983.  *See Iqbal*, 556 U.S. at 678;

*Twombly*, 550 U.S. at 555.  Accordingly, the Court will dismiss Plaintiff's Fourteenth Amendment equal protection claims.

## Conclusion

The Court will deny the following motions filed by Plaintiff: (1) motion to appoint counsel (ECF No. 2); (2) motion for a preliminary injunction (ECF No. 4); (3) motion to change venue (ECF No. 5); (4) motion for relief from judgment (ECF No. 7); and motion for leave to proceed *in forma pauperis* (ECF No. 13).  The Court will grant Plaintiff's motion to expedite (ECF No. 6), "motion to notice actual claim/pleading" (ECF No. 11), and "motion for order to allow access to the courts" (ECF No. 12) to the extent that the Court has considered Plaintiff's claims for relief in this opinion. Furthermore, having conducted the review required by the PLRA, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. § 1915A(b) and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore*, 114 F.3d at 611.  For the same reasons the Court concludes that Plaintiff's claims are properly dismissed, the Court also concludes that any issue Plaintiff might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).  Accordingly, the Court certifies that an appeal would not be taken in good faith.

A judgment consistent with this opinion will be entered.

Dated:  September 10, 2025                     /s/ Phillip J. Green
                                              PHILLIP J. GREEN
                                              United States Magistrate Judge